UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

12-20751

CR-COOKE

Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(2)(A)
18 U.S.C. § 2
18 U.S.C. § 982

UNITED STATES OF AMERICA

vs.

SILA LUIS,
ELSA RUIZ,
and
MYRIAM ACEVEDO,

                    Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federal healthcare program providing

benefits to persons who were over the age of 65 or disabled.  Medicare was administered by the

United States Department of Health and Human Services ("HHS") through its agency, the

Centers for Medicare & Medicaid Services ("CMS").  Individuals who received benefits under

Medicare where referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United

States Code, Section 24(b).

3.     "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.     Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

5.     CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs.  CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States.  In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims.  As administrator, Palmetto was to receive, adjudicate and pay, claims submitted by HHA providers under the Part A program for home health claims.

**Part A Coverage and Regulations**

**Reimbursements**

6.     The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

a.     the patient was confined to the home, also referred to as homebound;

b.     the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

c.     the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.     HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."   The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.   If a beneficiary was still eligible for care after the end of the first episode of care, a second episode

could commence.  There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8.      In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered.  At the end of a 60 day episode, when the final claim was submitted, the remaining portion of the payment would be made.  As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm.  Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9.      Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.      Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/

nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required, were a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary.  The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition.  The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.  These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

## Special Outlier Provision

12.     Medicare regulations allowed certified home health agencies to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency.  That certified home health agency would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees.

13.     For insulin-dependant diabetic beneficiaries, Medicare paid for insulin injections by an HHA agency when a beneficiary was determined to be unable to inject his or her own

insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary be confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries that had the most extensive care needs, which could result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

## RELEVANT ENTITIES AND DEFENDANTS

15.     LTC Professional Consultants, Inc. (LTC) was a Florida corporation incorporated on or about April 5, 1983, that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries.

16.     Professional Home Care Solutions, Inc. (Professional Home Care) was a Florida corporation incorporated on or about September 8, 2005, that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries.

17.     Defendant **SILA LUIS,** a resident of Miami-Dade County, Florida, was the president of LTC. **SILA LUIS** was also an owner and operator of LTC and Professional Home Care.

18.     Defendant **ELSA RUIZ,** a resident of Miami-Dade County, Florida, was an office administrator at LTC and an owner of Professional Home Care.

19.     Defendant **MYRIAM ACEVEDO**, a resident of Miami-Dade County, Florida, was an office administrator at LTC.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud**
**(18 U.S.C. § 1349)**

1.     Paragraphs 1 through 19 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From in or around January 2006, and continuing through in or around June 2012, the exact dates being unknown to the Grand Jury, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**SILA LUIS,**
**ELSA RUIZ,**
**and**
**MYRIAM ACEVEDO,**

did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection

with the delivery of and payment for health care benefits, items, and services.

## PURPOSE OF THE CONSPIRACY

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) causing the submission of false and fraudulent claims to Medicare; (b) offering and paying kickbacks and bribes to Medicare beneficiaries for the purpose of such beneficiaries arranging for the use of their Medicare beneficiary numbers by the co-conspirators as the bases of claims filed for home health care; (c) causing the concealment of the submission of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment and receiving of kickbacks; and (d) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## MANNER AND MEANS

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4.      **SILA LUIS** owned and controlled LTC and Professional Home Care.

5.      **ELSA RUIZ** owned and controlled Professional Home Care.

6.      **MYRIAM ACEVEDO** served as office administrator for LTC.

7.      **SILA LUIS, ELSA RUIZ, MYRIAM ACEVEDO,** and their co-conspirators would pay kickbacks to co-conspirator patient recruiters, for recruiting Medicare beneficiaries to be placed at LTC and Professional Home Care, which would, in turn, bill Medicare for home health and physical therapy services that were not medically necessary and/or were not provided.

8.      **SILA LUIS, ELSA RUIZ, MYRIAM ACEVEDO** and their co-conspirators would pay kickbacks to co-conspirator patient recruiters, knowing that the recruiters would pay

kickbacks to Medicare beneficiaries in exchange for the beneficiaries signing documents stating that they had received the home health care and physical therapy services that were billed to Medicare, when, in fact, the home health care services were not provided and were not medically necessary.

9.      **SILA LUIS, ELSA RUIZ** and their co-conspirators would cause patient files and POCs to be falsified to make it appear that Medicare beneficiaries qualified for and received home health services that in reality were not medically necessary and not provided.

10.     **SILA LUIS, ELSA RUIZ, MYRIAM ACEVEDO,** and their co-conspirators would distribute kickback payments to the co-conspirator patient recruiters on behalf of LTC and Professional Home Care.

11.     **SILA LUIS, ELSA RUIZ** and their co-conspirators would use medical billers to submit false and fraudulent claims to Medicare on behalf of LTC and Professional Home Care.

12.     **SILA LUIS, ELSA RUIZ, MYRIAM ACEVEDO** and their co-conspirators would cause the submission of approximately $74 million in false and fraudulent claims to Medicare under the provider numbers of LTC and Professional Home Care, seeking payment for the costs of home health services, including but not limited to diabetic injections, skilled nursing visits, therapy, and other treatments and services, that were not medically necessary and/or were not provided.

13.     As a result of these false and fraudulent claims, Medicare paid LTC and Professional Home Care approximately $45 million.

14.     **SILA LUIS, ELSA RUIZ, MYRIAM ACEVEDO,** and their co-conspirators would use the money fraudulently obtained from Medicare for their personal benefit, and to further the fraud, including through the payment of kickbacks to their co-conspirators.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Pay Health Care Kickbacks
### (18 U.S.C. § 371)

1.      Paragraphs 1 through 19 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or around January 2006, and continuing through in or around June 2012, the exact dates being unknown to the Grand Jury, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**SILA LUIS,**
**ELSA RUIZ,**
**and**
**MYRIAM ACEVEDO,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a federal health care program, that is, Medicare; and in return for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## PURPOSE OF THE CONSPIRACY

3.      It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (1) paying kickbacks to ensure that Medicare beneficiaries

would serve as patients at LTC and Professional Home Care; and (2) submitting claims to Medicare for home health services that the co-conspirators purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

4.      **SILA LUIS, ELSA RUIZ,** and **MYRIAM ACEVEDO** offered and paid kickbacks to co-conspirator patient recruiters in cash and check in return for their referring Medicare beneficiaries to LTC and Professional Home Care for home health services.

5.      **SILA LUIS, ELSA RUIZ,** and **MYRIAM ACEVEDO** would cause co-conspirator patient recruiters of LTC and Professional Home Care to offer and pay kickbacks to Medicare beneficiaries in order to induce them to serve as patients for LTC and Professional Home Care regardless of whether they actually needed home health services.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the conspirators committed and caused to be committed in the Southern District of Florida at least one of the following overt acts, among others:

1.      On or about October 12, 2006, **SILA LUIS** recertified signatory authority for a corporate bank account of LTC, SunTrust Bank account ending in #0536.

2.      On or about January 24, 2007, **ELSA RUIZ** obtained signatory authority for a corporate bank account of Professional Home Care, SunTrust Bank account ending in #4477.

3.      On or about October 4, 2007, **MYRIAM ACEVEDO** obtained signatory authority for a corporate bank account of LTC, Wells Fargo Bank account ending in #8976.

4.　　On or about December 4, 2007, **MYRIAM ACEVEDO** paid a kickback to a co-conspirator via LTC check No. #14476, drawn on LTC's corporate account at Wachovia Bank, in the approximate amount of $9,950.

5.　　On or about January 16, 2008, **MYRIAM ACEVEDO** paid a kickback to a co-conspirator via LTC check No. #14722, drawn on LTC's corporate account at Wachovia Bank, in the approximate amount of $2,300.

6.　　On or about January 16, 2009, **ELSA RUIZ** paid a kickback to a co-conspirator via Professional Home Care check No. #2932, drawn on Professional Home Care's corporate account at SunTrust Bank, in the approximate amount of $4,500.

7.　　On or about March 1, 2009, **SILA LUIS** paid a kickback to a co-conspirator via LTC check No. #311133, drawn on LTC's corporate account at SunTrust Bank, in the approximate amount of $4,000.

8.　　On or about March 1, 2009, **ELSA RUIZ** paid a kickback to a co-conspirator via Professional Home Care check No. #3213, drawn on Professional Home Care's corporate account at SunTrust Bank, in the approximate amount of $4,000.

9.　　On or about May 1, 2009, **SILA LUIS** paid a kickback to a co-conspirator via LTC check No. #311991, drawn on LTC's corporate account at SunTrust Bank, in the approximate amount of $4,000.

10.　　On or about May 1, 2009, **ELSA RUIZ** paid a kickback to a co-conspirator via Professional Home Care check No. #3568, drawn on Professional Home Care's corporate account at SunTrust Bank, in the approximate amount of $4,000.

11.　　On or about July 1, 2009, **SILA LUIS** paid a kickback to a co-conspirator via LTC check No. #312765, drawn on LTC's corporate account at SunTrust Bank, in the

approximate amount of $4,050.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 3-10
### Payment of Kickbacks in Connection with a Federal Health Care Benefit Program
### (42 U.S.C. § 1320a-7b(b)(2)(A))

1.      Paragraphs 1 through 19 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates enumerated below as to each count, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**SILA LUIS,**
**ELSA RUIZ,**
**and**
**MYRIAM ACEVEDO,**

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, in cash and in kind, that is, in the form of checks, as indicated below, directly and indirectly, overtly and covertly, to a person to induce such person to refer an individual for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicare as set forth below:

| Count | Defendant | Approximate Date | Approximate Kickback Amount |
|---|---|---|---|
| 3 | SILA LUIS | March 1, 2009 | $4,000 |
| 4 | SILA LUIS | May 1, 2009 | $4,000 |
| 5 | SILA LUIS | July 1, 2009 | $4,050 |
| 6 | ELSA RUIZ | January 16, 2009 | $4,500 |
| 7 | ELSA RUIZ | March 1, 2009 | $4,000 |

| Count | Defendant | Approximate Date | Approximate Kickback Amount |
|:---:|:---:|:---:|:---:|
| 8 | **ELSA RUIZ** | May 1, 2009 | $4,000 |
| 9 | **MYRIAM ACEVEDO** | December 4, 2007 | $9,950 |
| 10 | **MYRIAM ACEVEDO** | January 16, 2008 | $2,300 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

## FORFEITURE
## (18 U.S.C. § 982)

1.     The allegations contained in Counts 1-10 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which **SILA LUIS, MYRIAM ACEVEDO** and **ELSA RUIZ** have an interest.

2.     Upon conviction of any of the Counts, as alleged in this Indictment, the defendants, **SILA LUIS, MYRIAM ACEVEDO** and **ELSA RUIZ** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense pursuant to Title 18, United States Code, Section 982(a)(7).  The property subject to forfeiture includes but is not limited to:

A.     Bank Accounts

1.     Suntrust # 1000020080627 (Sila Luis)

2.     Suntrust # 1000062031348 (Sila Luis)

3.     Suntrust # 1000077285426 (Sila Luis)

4.     Eastern National Finance # 5802857406 (Sila Luis)

5.     Eastern National Finance # 5802852402 (Sila Luis)

-14-

6.      Washington Mutual # 8310248534 (Sila Luis)

7.      Bank of America # 898016254829 (Sila Luis - joint)

8.      Bank of America # 005506764882 (Sila Luis)

9.      Regions # 77837134 (Sila Luis)

10.     HSBC # 154730408 (Sila Luis)

11.     Suntrust # 1000020080623 (Sila Luis)

12.     Suntrust # 1000077285426 (Sila Luis)

13.     Regions # 0077177541 (Sila Luis - joint)

14.     Suntrust # 1000020080536 (LTC Professional Consultants, Inc. Payroll Account)

15.     Wachovia # 2000015428976 (LTC Professional Consultants, Inc.)

16.     Suntrust # 1000077284361 (LTC Professional Consultants, Inc.)

17.     Wachovia # 2000048214160 (LTC Professional Consultants, Inc.)


B.      <u>Real Property</u>

1.      6940 SW 90th Street, Miami, FL

2.      6055 SW 87th Ave, Miami, FL

3.      4779 Collins Ave, Miami Beach, FL

4.      3736 SW 107th St, Miami, FL

5.      3401 SW 11th St 2-A, Miami, FL

6.      1250 W Ave 4-D, Miami, FL

7.      1250 W Ave 4-G, Miami, FL

C.      <u>Money Judgment</u>

The sum that constitutes the gross proceeds the defendants derived from the offenses alleged in this Indictment, which sum may be sought as a money judgment.

3.      If any of the property described above, as a result of any act or omission of the

defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without

difficulty, the United States of America shall be entitled to forfeiture of substitute

property pursuant to Title 21, United States Code, Section 853(p), as incorporated

by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Sections 982(a)(7) and the procedures outlined in Title 21 United States Code, Section 853, as incorporated by Title 18 United States Code, Section 982(b)(1).

A TRUE BILL

FOREPERSON

WIFREDO A. FERRER
UNITED STATES ATTORNEY

SAM SHELDON
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JOSEPH S. BEEMSTERBOER
SENIOR TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO. _____

vs.

## CERTIFICATE OF TRIAL ATTORNEY*

SILA LUIS, et al.,

Defendants.
_____/

Superseding Case Information:

Court Division: (Select One)

| | | |
|---|---|---|
| X | Miami | _____ Key West |
| _____ FTL | _____ WPB | _____ FTP |

New Defendant(s)        Yes _____    No _____
Number of New Defendants        _____
Total number of counts        _____

I do hereby certify that:

1.    I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.    I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.    Interpreter:    (Yes or No)        Yes
      List language and/or dialect        Spanish

4.    This case will take    15    days for the parties to try.

5.    Please check appropriate category and type of offense listed below:

      (Check one)                                    (Check only one)

| I | 0 to 5 days | _____ | Petty | _____ |
|---|---|---|---|---|
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | X | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | X |
| V | 61 days and over | | | |

6.    Has this case been previously filed in this District Court? (Yes or No)    No
If yes:
Judge: _____    Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?        (Yes or No)    No    If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____    District of _____

Is this a potential death penalty case? (Yes or No)        No

7.    Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    _____ Yes    X    No

8.    Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    _____ Yes    X    No

_____
JOSEPH BEEMSTERBOER
SENIOR TRIAL ATTORNEY
Illinois Bar No. 6280961
Court ID No. A5501439

*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **SILA LUIS**

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**:  Ten (10) years' imprisonment

Count #: 2

Conspiracy to Pay Health Care Kickbacks

Title 18, United States Code, Section 371

**\*Max. Penalty**:  Five (5) years' imprisonment

Counts #: 3, 4, 5

Payment of Kickbacks in Connection with a Federal Health Care Benefit Program

Title 42, United States Code, Section 1320a-7b(b)(2)(A)

**\*Max. Penalty**:  Five (5) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name**: **ELSA RUIZ**

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**: Ten (10) years' imprisonment

Count #: 2

Conspiracy to Pay Health Care Kickbacks

Title 18, United States Code, Section 371

**\*Max. Penalty:**  Five (5) years' imprisonment

Counts #: 6, 7, 8

Payment of Kickbacks in Connection with a Federal Health Care Benefit Program

Title 42, United States Code, Section 1320a-7b(b)(2)(A)

**\*Max. Penalty:**  Five (5) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **MYRIAM ACEVEDO**

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**: Ten (10) years' imprisonment

Count #: 2

Conspiracy to Pay Health Care Kickbacks

Title 18, United States Code, Section 371

**\*Max. Penalty:** Five (5) years' imprisonment

Counts #: 9 and 10

Payment of Kickbacks in Connection with a Federal Health Care Benefit Program

Title 42, United States Code, Section 1320a-7b(b)(2)(A)

**\*Max. Penalty:**  Five (5) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**