UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-CR-20751-COOKE-TURNOFF

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

SILA LUIS, et al.,

      Defendants.
_____/

## THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE ORDER OF PRETRIAL DETENTION

The United States of America, by and through its undersigned attorney, respectively submits this Opposition to Defendant's Motion To Revoke Order of Pretrial Detention ("Def. Mot."). (D.E. #70). On October 16, 2012, Magistrate Judge McAliley ordered Defendant Sila Luis detained pending trial. See United States v. Luis, et al., No. 12-CR-20751-Cooke-Turnoff (S.D. Fla. Oct. 16, 2012) (Detention Order – Risk of Flight, D.E. #37) ("Detention Order"). This Court should uphold the decision of the Magistrate Judge and continue Defendant's pretrial detention for the following reasons:

(1) Probable cause exists indicating that Defendant committed the charged offenses, which involve fraud and other deceptive activities;

(2) Defendant's potential sentence creates a significant incentive to flee prior to trial; and

(3) Defendant possesses the means and opportunity to flee, as a result of her receipt of vast sums of money from fraudulent home health agencies ("HHAs"), history of foreign commercial and banking practices, foreign-held assets, and extensive foreign travels and connections.

Accordingly, as the Magistrate Judge held, no condition or combination of conditions can reasonably assure Defendant's appearance at trial as required by 18 U.S.C. § 3142(e).

## BACKGROUND

### A. Indictment and Charges

On October 2, 2012, a grand jury sitting in this District returned a 10-count indictment charging Defendants with various offenses stemming from a health care fraud conspiracy in South Florida. See United States v. Luis, et al., No. 12-CR-20751-Cooke-Turnoff (S.D. Fl. Oct. 4, 2012) (Indictment, D.E. #1). Specifically, Defendant Luis is charged with one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to defraud the United States and to pay health care kickbacks, in violation of 18 U.S.C. § 371; and three counts of payment of kickbacks in connection with a federal health care benefit program, in violation of 42 U.S.C. § 1320a-7b(b)(2). The Indictment also seeks forfeiture of various assets pursuant to 18 U.S.C. § 982.

### B. The Pretrial Detention Hearing

*Defendant's Fraudulent Scheme*. At an evidentiary hearing held on October 16, 2012 (the "Detention Hearing"), the Government proffered that Defendant masterminded and executed a health care fraud conspiracy which involved orchestrating and paying kickbacks to an elaborate network of patient recruiters and health care providers. (See Transcript of Pretrial Detention Hearing Before the Honorable Chris M. McAliley, United States Magistrate Judge ("Detention Tr.") at 4-5 (D.E. #54) (annexed hereto as Exhibit A).) Defendant, along with several co-conspirators, were charged as owners and/or operators of two entities—LTC Professional Consultants, Inc. ("LTC") and Professional Home Care Solutions, Inc. ("Professional Home Care")—which purported to provide home health care services, but which in fact were used as

vehicles to defraud the Medicare Program. (Id.) During the relevant period, LTC and Professional Home Care billed the Medicare program approximately $75 million for home health services for approximately 1900 beneficiaries, and were paid approximately $45 million. (Id. at 5-6.)

At LTC and Professional Home Care, Defendant constructed an extensive network of patient recruiters, health care providers, and beneficiaries to assist in the filing of false Medicare claims. (Id.) LTC and Professional Home Care paid kickbacks and bribes to patient recruiters so that they would place patients with each agency. (Id.) LTC and Professional Home Care would then fraudulently bill Medicare for home health and therapy services that were not medically necessary and/or were never provided. (Id.) Patient recruiters would, in turn, pay Medicare beneficiaries kickbacks for agreeing to be placed at LTC and Professional Home Care. (Id.)

Nurses and other health care workers were instrumental in concealing the fraud by falsifying patient files in order to make it appear that Medicare beneficiaries qualified for and were receiving home health services, which in reality were not medically necessary and/or not provided. (Id.)

On the basis of the Government's proffer, the Magistrate Judge concluded that "the weight of the evidence against the defendant supports pre-trial detention." Detention Order at 2.

*Defendant's Criminal Exposure*. Defendant Luis personally signed LTC's Medicare applications (Detention Tr. at 5), which attested to the fact that LTC would abide by Medicare's regulations and refrain from submitting fraudulent claims. As a result, Defendant is liable both for conspiracy to commit health care fraud and for conspiracy to violate the federal anti-kickback statute. See United States v. Medina, 485 F.3d 1291, 1298 (11th Cir. 2007). Defendant misconstrues this decision, but the Eleventh Circuit has held in clear terms that—for persons

3

who have affirmed that they will abide by Medicare regulations—Medicare claims for patients procured through the payment of kickbacks constitute <u>fraudulent</u> claims. <u>Id.</u> at 1304 (affirming that all amounts paid on claims after defendant signed Medicare provider applications were fraudulent, even though "there was no evidence presented that these claims were not medically necessary").

As noted, the evidence the Government intends to submit at trial in this case will substantiate that Defendant routinely billed for services that were not rendered and/or were not medically necessary. But this will be only part of the Government's case, which will also center on the sophisticated arrangement of kickback payments used by Defendant to recruit and retain patients. And nothing submitted by Defendant in seeking release through this motion alters the evidentiary record available to the Magistrate Judge.

On the basis of that record, the Magistrate Judge held that "a rational person in [Defendant's] shoes has an incentive to not be here" at the time of trial. (Detention Tr. at 51.) Indeed, a conservative estimate of Defendant's potential sentence, if she is convicted on all counts, is a term of imprisonment of 292 to 365 months in prison (which corresponds to a Sentencing Guidelines score of 40 levels). (<u>Id.</u> at 7.) While Defendant suggested at the Detention Hearing that any potential sentence would likely be lower and in the range of 10 to 15 years, the Magistrate Judge noted that even that period in prison would be an "awfully long time." (<u>Id.</u> at 51.) The Magistrate Judge therefore ruled that, under either analysis, Defendant's criminal exposure created a "significant incentive to flee this jurisdiction before trial." Detention Order at 2.

*Defendant's Means and Opportunity*. Defendant Luis is the signatory on LTC's corporate accounts through which tens of millions of dollars have flowed. (Detention Tr. at 7.)

4

Approximately $5.4 million were paid to Defendant and her family members from the corporate accounts of LTC and Professional Home Care. (Detention Tr. at 10-13, 51-52.) Defendant has not been forthcoming with Pretrial Services regarding the extent of her personal assets. For example, the holdings in many of the accounts listed by Defendant in both her original and supplemental reports to Pretrial Services were significantly underestimated in value. (See Detention Tr. at 14-15, 32.) Only recently, on December 31, 2012, did Defendant, through her daughter, submit to the Government a Financial Disclosure for Sila Luis.

The Government has moved to seize various assets of Defendant which it has been able to locate. A temporary restraining order was issued and later modified by the Court to include additional assets. See United States v. Luis, et al., No. 12-23588-CV-Huck-Bandstra (S.D. Fla. Oct.. 3, 2012) (Temporary Restraining Order, D.E. #11) ("TRO Order"); United States v. Luis, et al., No. 12-23588-CV-Huck-Bandstra (S.D. Fla. Nov. 5, 2012) (Order Granting Motion To Modify Temporary Restraining Order, D.E. #30) ("Modified TRO Order") (annexed hereto as Exhibits B & C). But, after entry of the TRO Order, the Government learned that Defendant Luis owned a safety deposit box at City National Bank, the existence of which she never disclosed to the Government. Bank records and video surveillance show that a family member of Defendant Luis visited the safety deposit box on Oct. 9, 2012, after that same family member had notice of the Court's TRO, but before City National Bank had frozen Defendant Luis's assets there.[1] (See Exhibit D (records showing Defendant Luis's ownership of the box and log reflecting visits to the box).) The bank records indicate that Defendant Luis's family member spent seven minutes inside the vault.

---

[1] The Government did not specifically list City National Bank in its first proposed TRO, and learned only later that Defendants had assets there. For this reason, City National Bank was served with the TRO several days after it was issued.

5

A list of the financial resources located in personal, custodial, or corporate bank accounts to which Defendant has access reveals over $700,000 in total deposits. (See Modified TRO Order at 1-2; Detention Tr. at 14.) Defendant further owns or controls several real properties in the United States valued at over $3.5 million in total, in addition to several properties in Mexico. (See Modified TRO Order at 2-3; Detention Tr. at 16-17, 22.) Defendant's financial records reveal extensive foreign banking activities in recent months. (Detention Tr. at 22-23.) In addition, over $8500 in cash and checks, and at approximately $250,000 (retail replacement value) in jewelry were recovered from a safe in Defendant's house. (Detention Tr. at 19-20, 52; see also United States of America v. Luis, et al., Case No. 12-23588-CIV-Huck-Bandstra (S.D. Fla. Dec. 27, 2012) (Supplemental Declaration of Special Agent Clint E. Warren, D.E. # 66) ("Supplemental Declaration") (annexed hereto as Exhibit E).)

Further, Defendant has traveled extensively to Cuba and Mexico over the last six years, has family contacts there, and possesses multiple passports, including one issued by the United States and two passports issued by Cuba. (Detention Tr. 20-21, 52-53.)

Assessing this record, the Magistrate Judge found that the evidence presented indicated the "sophistication and experience" necessary to flee the jurisdiction. Detention Order at 3.

## ARGUMENT

Detention pending trial requires an evaluation of the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

In reviewing the Detention Order, this Court must conduct a de novo review. But the Court need not undertake its own separate hearing, and the factual findings of the lower court

will not be disturbed unless such findings are clearly erroneous.  See United States v. King, 849 F.2d 485, 487, 489-90 (11th Cir. 1988).

The Magistrate Judge acted appropriately in determining that Defendant should be detained pending trial due to a risk of flight.  See 18 U.S.C. § 3142(e)(1) (Bail Report Act authorizes pretrial detention where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community").  The risk of flight[2] posed by Defendant was substantiated by a preponderance of the evidence, as required by law.  See 18 U.S.C. § 3142(f); United States v. Quartermaine, 913 F.2d 910, 917 (11th Cir. 1990).

Defendant faces serious charges in the Indictment, and the evidence presented at the Detention Hearing strongly weighs in favor of pretrial detention.  The Government proffered that Defendant was a leading participant in a vast criminal conspiracy to pay kickbacks to patients and submit fraudulent claims to Medicare for services that were not rendered and/or were not medically needed.  If convicted, Defendant faces a substantial prison term, and possesses the means, opportunity and incentive to flee prior to trial.  The Magistrate Judge reached these conclusions on the basis of an extensive record.

Nothing presented by Defendant in seeking release now calls into question the conclusions of the Magistrate Judge.  The issues of medical necessity raised by Defendant's motion address only one aspect of the Government's case, which is also based on the payment of kickbacks, the fabrication of patient records, and the submission of claims for services that were not rendered, in addition to the provision of unnecessary medical services.  No evidentiary

---

[2]  Risk of flight or danger to the community are independent bases for pretrial detention.  See United States v. Rodriguez, 897 F. Supp. 1461, 1463 (S.D. Fla. 1995) ("Proof of both flight risk and danger to the community is unnecessary.").

7

hearing is therefore necessary to evaluate the record below and affirm the decision of the Magistrate Judge.

### A. The Charged Offenses and the Weight of Evidence Present a Significant Risk of Flight

Defendant's criminal activity demonstrates a sophisticated ability to deceive authorities and conceal fraud.  The weight of evidence against Luis is substantial and the likelihood of a significant prison term provides Defendant with considerable incentive to flee prior to trial.

For years, Luis was able to maintain a veneer of legitimacy around two home health agencies in order to perpetuate her crimes.  The entire fraud at LTC and Professional Home Care depended on the creation of a network of co-conspirators to assist in organizing and disguising their fraudulent conduct—with Luis as the lead participant.  (Detention Tr. at 5-6.)  Instead of receiving legitimate patient referrals, Defendant surreptitiously paid cash kickbacks to patient recruiters, creating a pool of Medicare beneficiaries for whom LTC and Professional Home Care could submit fraudulent Medicare claims.  (Id.)

Nurses and other health care providers were also paid vast sums of money, which even Defendant acknowledges.  See Def. Mot. at 8.  In many instances, this was done not in return for medically-needed services, but instead in order manufacture falsified patient files, prescriptions, and other records—all of which were necessary to make it appear that LTC and Professional Home Care were authentic home health agencies providing genuine services.  (Detention Tr. at 5-6.)  They were not.  Ultimately, the harm caused by Defendant was extensive, with tens of millions in lost taxpayer dollars.  (Id.)

The weight of the evidence against Defendants is substantial.  Although Defendant reported a monthly salary of only $3,000 in her reports to Pretrial Services in October 2012, Luis and her family members have received approximately $5.4 million from LTC and Professional

8

Home Care. Numerous cooperating witnesses have described to the Government the critical, leadership role that Defendant played in the fraudulent scheme. Those witnesses will testify that patients did not need or did not receive services, and that extensive use of kickbacks was made in order to recruit and retain patients—all at the direction of Defendant. In short, the strength of the Government's evidence strongly supports pre-trial detention.

Despite Defendant's suggestion to the contrary (Def. Mot. at 5-6), the conduct at issue in the Indictment does not implicate a mere "handful" of health care workers or a fraction of LTC and Professional Home Care's patient population. Kickbacks were a vital part of LTC and Professional's modus operandi, and the testimony of numerous cooperating witnesses will substantiate this fact. Moreover, Defendant cannot avoid criminal liability by arguing she relied upon physicians (who provided prescriptions or Plans of Care) or laboratories (for confirmatory diabetic testing).[3] (See Def. Mot. at 5-6.) Treatment and visit logs were falsified, and prescriptions can be procured from doctors through illegal payments. And, most importantly, if patients did not need or did not receive the services for which Medicare was billed, mounds of paperwork in LTC or Professional Home Care's files are no defense to the charges of conspiracy to commit health care fraud or violate the anti-kickback statute.

Defendant suggests that the existence of voluminous patient files seized from LTC and Professional Home Care are substantial exculpatory evidence. See Def. Mot. at 4-7. But the fact that patient files were falsified, specifically to create an appearance of legitimacy, was presented

---

[3] Patients may have also signed treatment logs and were subjected to periodic compliance visits. See Def. Mot. at 6. But, as cooperating witnesses will further testify, many Medicare beneficiaries, health care providers, and others were part of the kickback scheme, receiving thousands of dollars per episode of care in illegal kickbacks. Though Defendant notes in her motion that "compliance visits" occurred, it was Defendant's son-in-law who supposedly performed periodic compliance visits on behalf of LTC and Professional Home Care. See Def. Mot. at 6. The son-in-law's wife, Defendant's daughter, received approximately $460,000 from Defendant's fraudulent HHAs. (See Detention Tr. at 13.)

to the Magistrate Judge. (Detention Tr. at 6.) And nothing offered now by the Defendant fundamentally alters the record below or should disturb the conclusion that pretrial detention is warranted.

Critically, as the signatory on LTC Medicare applications, Luis's payment of kickbacks alone makes her liable both for conspiracy to violate the anti-kickback statute <u>and</u> to commit health care fraud. Defendant suggests otherwise, but the Eleventh Circuit has spoken clearly and repeatedly on this issue. See <u>United States v. Medina</u>, 485 F.3d 1291, 1298 (11th Cir. 2007); <u>United States v. 10150 NW 133 Street, Hialeah Gardens, Florida</u>, No. 07-10425, 278 Fed. Appx. 880, 883 (11th Cir. May 15, 2008) (unpublished opinion) ("<u>Hialeah Gardens</u>"); <u>United States v. Guerra</u>, No. 08-10873, 307 Fed. Appx. 283, 286 (11th Cir. Jan. 9, 2009) (unpublished opinion).

Defendant's conspiracy involving kickbacks violates both statutes because "a reasonable jury could conclude that [Defendant] committed health care fraud after she signed the [Medicare] applications stating that she would follow Medicare's rules and regulations," because "evidence [] show[s] that the kickback pattern continued after [Defendant] signed the forms." <u>Medina</u>, 485 F.3d at 1298. In other words, "[e]very time [Defendant] received a payment from Medicare for a claim that resulted from a kickback, she committed fraud because Medicare would not have paid the claim had it known of the kickback." <u>Hialeah Gardens</u>, 278 Fed. Appx. at 883.

Put simply, while kickbacks are critical part of the evidence against Defendant, this is not a just a "kickback case," as Defendant suggests. See Def. Mot. at 7. Indeed, under the Indictment, Defendant faces five separate counts, charging conspiracy to violate the anti-kickback statute and health care fraud conspiracy in multiple forms—including fraudulent claims for unneeded or unperformed services or for patients procured through kickbacks. Defendant's base sentencing level of 6 should be increased by 24 levels because she is responsible for over

$50 million in fraudulent billings.[4]  See U.S.S.G. § 2B1.1(b)(1).  In addition, Defendant's sentencing range would be increased by 4 levels because the offense involved a Federal health care offense involving a Government health care program and the loss was greater than $20 million.  See U.S.S.G. § 2B1.1(b)(8).  Additional enhancements should be applied due to her aggravating role as an owner of LTC/Professional Home Care and as a leading participant in the fraudulent scheme (4 levels pursuant to U.S.S.G. § 3B1.1) and her use of sophisticated means (2 levels pursuant to U.S.S.G. § 2B1.1(b)(10)(C))—for a total Sentencing Guidelines level of 40.  Therefore, if convicted on all charges, Defendant's sentence could range as high as 292 to 365 months.  Additionally, Defendant faces potential forfeiture of at least $45 million, which represents the amount of money that Medicare actually paid out as a result of Defendant's criminal activities.[5]  In short, Defendant has a significant incentive to flee before trial.

In any event, even considering the kickback count in isolation, pretrial detention is appropriate, and has been ordered by this Court in other cases involving only kickback-related charges.  See, e.g., Detention Order, United States v. Garcia, 12-3467-MJ-Simonton, at 1-3 (S.D. Fla. Nov. 6, 2012); Detention Order, United States v. Morales, 12-20644-CR-Lenard, at 1-3

---

[4] Intended loss is calculated based on the aggregate dollar amount of fraudulent bills submitted to Medicare.  See U.S.S.G. § 2B1.1, Application Note 3(F).  Defendant's citation to Medina is inapposite.  See Def. Mot. at 7-8.  In Medina, as the Eleventh Circuit noted, the district court in that case had made only limited factual findings in determining loss amount, and there was not sufficient evidence that the services at issue were not medically necessary and/or were not provided.  485 F.3d at 1304.  The Government takes the very opposite position here, and intends to prove at trial that Defendant was not in the business of providing genuine health care services.

[5] Defendant is simply wrong that kickback charges have no associated loss amount.  This is not supported by the Eleventh Circuit's decision in Medina.  As a district court has held, the Medina decision in fact "supports the Government's argument that the amount of its damages resulting from the payment of false claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims."  United States ex rel. Freedman v. Suarez-Hoyos, No. 8:04-CV-933-T-24, 2012 WL 4344199, at *5 (M.D. Fla. Sept. 21, 2012) (unpublished opinion).

(S.D. Fla. Sept. 14, 2012); see also Order, United States v. Garcia, 12-20843-CR-Lenard/O'Sullivan, at 1 (S.D. Fla. Dec. 13, 2012) (refusing to modify order of pretrial detention).

### B. Defendant's Financial Assets and Foreign Connections Present a Significant Risk of Flight

*Defendant's Financial Resources.* The Medicare Program paid nearly $45 million to LTC and Professional Home Care between 2006 and 2012, but the majority of that money cannot be located. Investigation has revealed that Defendants are signatories on numerous bank accounts controlled by LTC and Professional Home Care. Significant sums of money were withdrawn from these accounts, subsequently turned into cash, and transferred to Defendant Luis and her co-conspirators, including approximately **$4.5 million** to Luis, of which at least **$245,000** was turned into cash. (See Detention Tr. at 12.) In ordering detention, the Magistrate Judge found that the sums received by Defendant were "extraordinarily high." (Detention Tr. at 51-52); see also Detention Order at 2.

Family members of Defendant have also received funds from LTC and Professional Home Care, including her husband, Wilfredo Luis, who received approximately $1.4 million, and her daughter, Lissandra Guerrero, who received approximately $460,000.[6] (See Detention Tr. at 13, 52; see also Supplemental Declaration at 2.) Numerous family members of Defendant received hundreds of thousands of dollars from LTC and Professional Home Care. (See Supplemental Declaration at 2-3.) Defendant also possesses valuable real property both here and in Mexico. (See Detention Tr. at 16-17, 22, 52-53.) And Defendant has hundreds of thousands of dollars in bank accounts in Mexico. (See Detention Tr. at 22.)

---

[6] The Magistrate Judge also rejected a proposed third-party custodial arrangement, which called for placing Defendant under the supervision of her daughter and other family members. (See Detention Tr. at 48-49.)

The Government has moved to freeze numerous bank accounts held by Defendant and her family members. (See TRO Order; Modified TRO Order.) The investigation into Defendant's methods of moving and concealing assets, and the current locations of those assets, along with financial tracing, is ongoing.

Indeed, when given the opportunity, Defendant twice chose to significantly undervalue her personal financial holdings.[7] (See Detention Tr. at 14-17, 31-32.) Concealment of financial resources has been considered by this Court in upholding pretrial detention in other home health care fraud cases. See, e.g., Order on Appeal of Pretrial Detention, United States v. Niebla, 12-20564-CR-Ungaro, at 6 (S.D. Fla. Sept. 11, 2012) (ordering detention under indictment charging kickback-related offenses and money laundering).

*Defendant's Foreign Travel and Connections*. Defendant's personal history and travel practices also underscore the risk that she might attempt to flee prior to trial. Luis has traveled approximately 40 times since 2006, including approximately **30 trips abroad to Cuba, Mexico, or other locations**. (See Detention Tr. at 21.) Furthermore, Luis was born in Cuba, and presently has family ties there (which the Magistrate Judge found were an important impetus for her frequent travels abroad). (See Detention Tr. at 33, 35, 48, 52-53.) During the execution of a search warrant at Defendant's residence on October 4, 2012, law enforcement located multiple airline tickets, including for Defendant and her husband for travel to Cuba on October 6, 2012. (Detention Tr. at 21.) The Magistrate Judge also rejected—correctly—the suggestion that the flight risk posed by Defendant could be mitigated by a waiver of extradition, which would not

---

[7] For example, Defendant's bank account at Regions Bank was valued at $100,000 in both reports submitted by Defendant to Pretrial Services in October 2012. But the account contains nearly twice as much—approximately $194,000. (See Modified TRO Order at 2; Detention Tr. at 14-15.) Among other accounts, Defendant also had access to several additional accounts at City National Bank valued at approximately $250,000 in total. (See Modified TRO Order at 2.) These were not originally reported by Defendant to Pretrial Services or the Court.

13

remove the obstacles the Government would face in retrieving her from a foreign jurisdiction, if Defendant were to flee.  (See Detention Tr. at 53.)

At bottom, it should be evident that Defendant has access substantial sums of money and foreign connections, which would enable her to flee in advance of trial, if released.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court uphold the Detention Order and continue Defendant Luis's detention pending trial.

>Respectfully submitted,
>
>WIFREDO A. FERRER
>UNITED STATES ATTORNEY
>
>By: /s/
>Joseph S. Beemsterboer
>Senior Trial Attorney
>Court Id. No. A5501439
>United States Department of Justice
>Criminal Division, Fraud Section
>1400 New York Avenue, N.W.
>Washington, D.C.  20005
>Phone:  (305) 961-9269
>Fax:  (202) 514-7021
>joseph.beemsterboer@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on January 3, 2013, I electronically filed and served this document using CM-ECF.

/s/
Joseph S. Beemsterboer
Senior Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section